IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

_____

UNITED STATES OF AMERICA,    )
    )
    Plaintiff,    )
    )
v.    )
    )   **No. 15-cr-20206-JTF-tmp**
RICKIE FRIAR,    )
    )
    Defendant.    )
    )

_____

REPORT AND RECOMMENDATION

_____


Before the court by order of reference is defendant Rickie Friar's Motion to Suppress. (ECF No. 15.) The government responded in opposition to Friar's motion. (ECF No. 17.) The court subsequently held a suppression hearing. At the hearing, the government called as witnesses Deputy Hunter Crossley and Sergeant Annette Cotton of the Shelby County Sheriff's Office, as well as Friar's long-time housekeeper, Christina Riba. The court has now considered the memoranda of law filed in support of and in opposition to the motion to suppress, the testimony of the witnesses, and the applicable law. The court hereby submits the following proposed findings of fact and conclusions of law, and recommends that the motion to suppress be denied.

## I. PROPOSED FINDINGS OF FACT

As an initial matter, the court finds credible all three of the witnesses who testified at the suppression hearing. Therefore, the court adopts their version of the events as its findings of fact.

At all times relevant to the events giving rise to the charges in the indictment, Rickie Friar resided at a house located in Millington, Tennessee. For a seven-year period leading up to July 2015, Christina Riba performed various housekeeping services for Friar. Riba had her own key to the house and knew how to activate and deactivate the home security system. Sometime in or around July 2015, Friar asked Riba to clean his house and watch his cat while he was out of town. During this same time, Riba was also babysitting "M," a sixteen-year-old girl.[1] During one conversation that Riba had with M, M told Riba that she did not like going to her "dad's friend's house" and described her dad's friend to Riba. Based on M's facial expressions in response to Riba's comments, Riba believed M was referring to Friar.

On the evening of Sunday, July 12, 2015, Riba went to Friar's house to finish some laundry and to check on his cat.[2]

_____

[1]Riba testified that M had "special issues" and described her as having the mental capacity of an eight-year-old.

[2]The court takes judicial notice that July 12, 2015 was a Sunday.

Riba brought M with her to Friar's house, but told M she could wait in the car if she did not want to go inside. M decided to come inside the house, and stayed upstairs while Riba went downstairs to put the laundry into the dryer. When Riba returned upstairs, she saw M holding an Apple iPad tablet ("iPad"). M, who had password access to the iPad, spontaneously said to Riba, "I just want to show you that there's no naked pictures of me on here . . . there's things on here that you shouldn't see." Troubled by this statement, Riba asked to see the iPad. Riba opened the photo gallery and saw rows of pictures categorized by date. One of the pictures she saw was of an eight-year-old girl, "O," who Riba had seen together with Friar on prior occasions. The picture showed Friar lying in bed and O holding his penis. Riba then proceeded to view all of the other pictures on the iPad.

Riba called the Shelby County Sheriff's Office at around 9:00 p.m. or 10:00 p.m. that evening to report what she had found. Riba told M to wait in her car while Riba sat on the porch with the iPad and waited for the police to arrive. Approximately three hours later, at around 1:00 a.m. on July 13, Deputy Hunter Crossley arrived at the residence. When Deputy Crossley initially encountered Riba, she was "very excited and all over the place with what she was trying to say." To help

Riba gather her thoughts, Deputy Crossley asked her to sit inside his patrol vehicle. Riba then proceeded to describe to Deputy Crossley what she had seen on the iPad. In addition to describing the picture involving O and Friar, Riba told Deputy Crossley that M had previously told her that Friar "always tries to take my bra strap off and makes me feel really uncomfortable." Riba also informed Deputy Crossley that she saw on the iPad a picture of a naked two-year-old girl, a picture of a child without underwear on taken underneath a table at a restaurant, a video of two girls filming Friar sleeping naked, and multiple pictures of naked children. Riba asked Deputy Crossley if he wanted to see the pictures for himself. Deputy Crossley declined, and instead called his shift supervisor, Sergeant Annette Cotton.[3] Sergeant Cotton instructed Deputy Crossley not to look at the contents on the iPad. When Sergeant Cotton arrived on the scene, Riba handed the iPad to her. Without viewing any of the images, Sergeant Cotton (or possibly another deputy at her direction) put the device into "airplane

---

[3]Prior to her assignment as a sergeant with the Shelby County Sheriff's Office, Sergeant Cotton worked six years on assignment with the Child Exploitation Unit with the Federal Bureau of Investigation ("FBI") in Memphis, Tennessee.

mode."[4]  The iPad was then placed in a bag and transported to the
property room, pending an application for a search warrant.  At
some point during her encounter with the officers, Riba told
them that she believed Friar had gone to visit family in
Oklahoma.[5]

Later on that same day, at approximately 1:15 p.m., a
Tennessee state court judge signed a search warrant for the
iPad.  The search warrant affidavit, signed by Shelby County
Sheriff's Sergeant N. Hillman, provided as follows:

> On 07/13/2015 at 0254 hours, Sgt. Hillman of
> Special Victims Unit was contacted by Patrol Sgt.
> Cotton who was on the scene at [redacted] Drive in
> Millington, TN.  Sgt. Cotton advised that complainant
> [redacted] disclosed she had been cleaning the above
> listed residence belonging to suspect Rickie Friar for
> approximately seven (7) years.  Complainant stated she
> was cleaning Friar's residence on 07/11/2015 with
> juvenile S.M. (16 YOA).   S.M. was assisting
> complainant in cleaning the home and almost knocked an
> Apple iPad thought to belong to Rickie Friar, off of a
> table in the living room of Friar's home.  S.M. asked
> complainant "do you know what's on the tablet" and
> continued to say "there are bad things on there and I
> even know the passcode."  S.M. opened the iPad tablet
> and complainant [redacted] observed a photo of a girl
> approximately 9 YOA holding suspect Friar's penis in
> her hand as he was laying in his bed.  Complainant

---

[4]Sergeant Cotton testified that it was her normal procedure to
put an electronic device into airplane mode before seizing it so
that no transmissions could come or go from the device and to
prevent information from being erased from the device from a
remote location.

[5]See ECF No. 17, Pla.'s Resp. to Mot. to Dismiss at 2.

stated she also observed videos and numerous other
sexually explicit photos of what appeared to be
juveniles. The iPad was taken as evidence, placed in
airplane mode by SCSO [Shelby County Sheriff's Office]
and placed in the MPD [Memphis Police Department]
property room.

(ECF No. 17-1, exhibit to Pla.'s Resp. to Mot. to Suppress.)

Upon execution of the search warrant, officers found images
and videos on the iPad depicting child pornography and sexual
exploitation of a minor, consistent with those described by
Riba. Based on these findings, the officers later that same day
obtained a state search warrant for Friar's residence. Pursuant
to that second warrant, officers seized computers, digital
storage devices, and cameras from the residence. A warrant for
Friar's arrest was also issued. Officers found Friar driving
through Arkansas accompanied by a minor female, and took him
into custody. Officers conducted a search incident to arrest
and seized a cell phone and another iPad tablet. Subsequently,
the FBI's Memphis Child Exploitation Task Force was asked to
assist in the investigation. Federal agents obtained a federal
search warrant to examine the same digital devices seized from
Friar's residence as well as the cell phone and iPad seized at
the time of Friar's arrest.

On August 18, 2015, a federal grand jury returned a 12-
count indictment charging Friar with knowingly transporting a

minor across state lines with the intent to engage in sexual activity, in violation of 18 U.S.C. § 2423(a) (Count 1); production of child pornography, in violation of 18 U.S.C. § 2251(a) and (e) (Counts 2 through 11); and possession of a computer containing child pornography, in violation of 18 U.S.C. § 2252(a)(4)(B) (Count 12).

In his motion to suppress, Friar argues that the initial seizure of the iPad from his residence was unlawful because it was conducted without a warrant or exigent circumstances. Friar further argues that the first state search warrant for the iPad was defective because it lacked probable cause and was based on unreliable information. Friar contends that due to the illegal search and seizure of the iPad, all of the evidence seized by the officers, including evidence later seized as a result of the other search warrants and arrest warrant, must be suppressed pursuant to the "fruit of the poisonous tree" doctrine.

## II. PROPOSED CONCLUSIONS OF LAW

### A. Expectation of Privacy

As an initial matter, the government argues that Friar must establish that he had an expectation of privacy in the iPad in order to challenge its seizure and subsequent search. To meet this burden, a defendant must demonstrate (1) that he had a subjective expectation of privacy in the item seized, and (2)

that his expectation was objectively reasonable. United States v. Washington, 573 F.3d 279, 282-83 (6th Cir. 2009) (citing United States v. Pollard, 215 F.3d 643, 647 (6th Cir. 2000)). "An expectation is objectively reasonable only when it is one that society is prepared to recognize as legitimate." Id. Defendant bears the burden of demonstrating that he had a legitimate expectation of privacy in the place that was searched. United States v. Mastromatteo, 538 F.3d 535, 544 (6th Cir. 2008) (citing United States v. Talley, 275 F.3d 560, 563 (6th Cir. 2001)). As the Sixth Circuit has observed, homeowners "of course have a reasonable expectation of privacy in their homes and in their belongings – including computers – inside the home." Guest v. Leis, 255 F.3d 325, 333 (6th Cir. 2001). The iPad belonged to Friar, was located inside his home, and was protected by a passcode. The fact that Riba had access to Friar's residence as his housekeeper, or that M knew the iPad's passcode, does not negate Friar's privacy interest in the device. The court finds that Friar had an objectively reasonable expectation of privacy in the iPad, and thus may challenge its seizure and subsequent search.[6]

---

[6]The government also questions whether Friar has "standing" to seek suppression of the other devices found inside his home and in his possession at the time of his arrest, including computers, a camera, a cell phone, and digital storage devices.

**B.  Seizure of the iPad**

The Fourth Amendment to the United States Constitution provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV.  "A 'seizure' of property occurs when there is some meaningful interference with an individual's possessory interests in that property."  United States v. Jacobsen, 466 U.S. 109, 113 (1984).  The government does not dispute that the officers "seized" the iPad when they took possession of it from Riba.

"[P]robable cause is a flexible, common-sense standard.  It merely requires that the facts available to the officer would warrant a man of reasonable caution in the belief that certain items may be contraband or stolen property or useful as evidence of a crime."  United States v. McLevain, 310 F.3d 434, 441 (6th

---

Friar presented no evidence at the suppression hearing on this issue.  Although it would appear (based on the limited evidence before the court) that Friar had a reasonable expectation of privacy in these electronic devices as well, the court need not reach this issue because, as discussed below, the subsequent search of the iPad did not violate Friar's Fourth Amendment rights.  Therefore, these other devices are not subject to suppression because they are not fruits of an illegal search or seizure.

Cir. 2002) (quoting <u>Texas v. Brown</u>, 460 U.S. 730, 742 (1983));

<u>see also</u> <u>Florida v. Harris</u>, 133 S. Ct. 1050, 1053 (2013);

<u>Illinois v. Gates</u>, 103 S. Ct. 2317, 2333 (1983).  Probable cause

exists where, given the totality of the circumstances, there are

reasonable grounds for the belief of wrongdoing, which is

"supported by less than prima facie proof but more than mere

suspicion."  <u>United States v. Bennett</u>, 905 F.2d 931, 934 (6th

Cir. 1990); <u>see also</u> <u>United States v. Brown</u>, 449 F.3d 741, 745

(6th Cir. 2006).  Here, the officers received reliable

information from Riba - a concerned citizen who worked as

Friar's housekeeper for seven years - that she personally saw

images and videos depicting child pornography and sexual

exploitation of a minor on the iPad.[7]  Based on this reliable

information, the officers had probable cause to believe that the

iPad contained evidence of criminal activity.

Although the officers had the requisite probable cause at

the time they seized the iPad, they did not have a warrant.

---

[7]Riba's viewing of the iPad was a "private search" and therefore
did not infringe upon Friar's Fourth Amendment rights.  <u>See</u>
<u>Jacobsen</u>, 466 U.S. at 113-14 (explaining that the Fourth
Amendment only protects against "governmental action; it is
wholly inapplicable 'to a search or seizure, even an
unreasonable one, effected by a private individual not acting as
an agent of the Government or with the participation or
knowledge of any governmental official.'") (quoting <u>Walter v.
United States</u>, 447 U.S. 649, 662 (1980)); <u>United States v.
Lichtenberger</u>, 786 F.3d 478, 481-83 (6th Cir. 2015) (discussing
private search doctrine articulated in <u>Jacobsen</u>).

Generally, warrantless searches and seizures are presumptively unreasonable. United States v. Ashbourne, 571 F. App'x 422, 424 (6th Cir. 2014). But there are exceptions, such as the exception for "exigent circumstances." Id. (citing Mincey v. Arizona, 437 U.S. 385, 393–94 (1978)). One recognized exigent circumstance is the imminent destruction of evidence, i.e., the "urgent need to prevent evidence from being lost or destroyed." Id. (quoting United States v. Sangineto–Miranda, 859 F.2d 1501, 1511 (6th Cir. 1988)). In the case at bar, the government did not argue in its response to Friar's motion or at the suppression hearing that the officers seized the iPad because of a fear that the evidence would be imminently destroyed or lost. Neither Deputy Crossley nor Sergeant Cotton testified that the iPad was seized from the residence due to concerns that evidence would be destroyed if they left the iPad with Riba while they applied for a search warrant. The only evidence presented on the issue of potential destruction of evidence was Sergeant Cotton's testimony that, generally, her normal procedure was to place electronic devices like iPads in airplane mode in order to prevent remote destruction of evidence. There is no evidence that the officers believed Riba posed a threat of destroying the iPad or the images. Moreover, the officers knew that Friar was out of town at the time, and they had no indication that he was

aware of Riba's discovery or knew about the ongoing investigation.

The central issue, then, is whether the officers violated Friar's Fourth Amendment rights when, without exigent circumstances, they seized the iPad for the purpose of preserving it until they could obtain a search warrant. There is a split of authority within the Sixth Circuit on this issue. According to United States v. Respress, 9 F.3d 483 (6th Cir. 1993), exigent circumstances are not required, so long as the duration of the seizure was reasonable. According to United States v. Bradley, 488 F. App'x 99 (6th Cir. 2012) and United States v. Saddler, 498 F. App'x 524 (6th Cir. 2012), exigent circumstances are a threshold requirement.[8]

In Respress, defendant Michael Respress was a passenger on a flight from Ontario, California to Cincinnati, Ohio. Task Force Officer Joseph Jones took notice of Respress because he allegedly matched the "drug courier profile." After Officer Jones observed Respress talking to a gate agent, Officer Jones approached the gate agent and asked what Respress's travel plans were. He was told that Respress had a connecting flight to Akron/Canton, he had made reservations for his one-way Ontario-

---

[8]The court notes that Bradley and Saddler are both unpublished opinions.

Cincinnati-Akron ticket thirteen hours before departure, and he had purchased the $685 ticket with cash just twenty minutes before departure. When Officer Jones approached Respress and questioned him, Respress stated that he had been in Ontario visiting family for a few days and was returning to his home in Akron. However, Respress's ticket was issued to a "Michael Foster" and his driver's license showed that he lived in Cleveland. Respress then walked away, but instead of continuing to his connecting flight, he exited the airport terminal and entered a taxi. Officers stopped the taxi, and when asked why he was leaving the airport and what he was going to do about his checked luggage, Respress responded that he was going to Cleveland and would pick up his suitcase there. He told the officers that he had changed his plans and decided to visit a friend in Cincinnati, but he could not provide an address for his friend. Officers found $700 on Respress's person and his plane ticket hidden behind the cushion of the rear seat. The taxi driver told the officers that Respress had instructed him to drive to the bus station so that he could catch a bus to Cleveland. When Respress would not consent to a search of his suitcase, Officer Jones told Respress that he would attempt to seize his suitcase and get a search warrant for it. Respress then departed. During the next several hours, Officer Jones

retrieved the suitcase from the airline, completed an affidavit, and presented the affidavit to a magistrate judge. Approximately ten hours after the suitcase was seized, a magistrate judge issued a search warrant for the suitcase. A search was conducted and 2.8 kilograms of cocaine were seized from the suitcase. Respress was later indicted for possession of cocaine with intent to distribute. Before trial, he filed a motion to suppress challenging the pre-warrant seizure of his suitcase. The district court denied the motion. Id. at 484-85.

On appeal, the Court of Appeals (in a 2-1 decision) affirmed the denial of the motion to suppress. After distinguishing the facts before it from cases relied upon by the parties, including United States v. Place, 462 U.S. 696 (1983), the court explained that "[t]his is not a case involving reasonable suspicion which justifies something less than a search . . . . This was a plain old-fashioned seizure of a person's effects, based on probable cause, in order to prevent the disappearance of evidence and so that a warrant could be obtained and a search conducted." Respress, 9 F.3d at 486. The court stated that "the practice of seizing an item based on probable cause in order to secure a search warrant . . . [has] long been lawful." Id. The court concluded that the officers had probable cause to believe that Respress's suitcase contained

- 14 -

incriminating evidence.  Id. at 487-88.  The court went on to caution, however, that "even with the existence of probable cause to effect a seizure, the duration of the seizure pending the issuance of a search warrant must still be reasonable."  Id. at 488.  The court found that the ten-hour length of time between the seizure of the suitcase and the issuance of the warrant, given the time of day, was not unreasonable.  Id.

Although Respress quoted Place for the proposition that the Fourth Amendment permits the seizure of property pending issuance of a warrant "if the exigencies of the circumstances demand it or some other recognized exception to the warrant requirement is present," see Respress, 9 F.3d at 486, the court in Respress quite clearly did not rely upon the imminent destruction of evidence or any other type of exigent circumstance in upholding the seizure.[9]  Instead, the court found the seizure lawful because (1) the officers had probable cause that the suitcase contained incriminating evidence; (2) they seized the suitcase for the purpose of preserving evidence

_____

[9]Indeed, the dissent took "strong opposition" to the majority opinion because "[t]he majority's belief that [the above quoted language] of Place states that having probable cause is itself enough to seize a bag without a warrant renders the clause beginning with 'if' entirely meaningless."  Id. at 489 (Jones, J., dissenting).

pending the issuance of a warrant; and (3) the duration of the seizure was reasonable.

In Bradley, 488 F. App'x 99, investigators conducting an undercover investigation were able to determine that child pornography had been downloaded at a particular fire station by a specific crew. Investigators went to the fire station and met with defendant Eric Bradley. Bradley allowed the investigators to access his laptop computer and provided them with his password. The investigators found on the laptop a "Globally Unique Identifier" associated with the downloading of suspected child pornography files. Investigators advised Bradley that they were seizing his laptop and applying for a search warrant. Bradley denied any knowledge of child pornography on his computer. The investigators obtained a search warrant for the computer the following day, and a forensic examination uncovered numerous images and videos containing suspected child pornography. Bradley moved the district court to suppress all evidence obtained from the laptop, arguing that the investigators had seized his computer without obtaining a search warrant and without his consent, and that no exception to the warrant requirement applied. The district court denied the motion, finding that the investigators had probable cause that the laptop contained child pornography, their concern that

Bradley would destroy the computer or any evidence it contained constituted exigent circumstances, and the 26-hour delay in obtaining the warrant was not unreasonable. Id. at 101-02. The Sixth Circuit affirmed. The court explained that

> One of the recognized situations that may justify acting without a warrant is an "urgent need to prevent evidence from being lost or destroyed." To establish exigent circumstances under this exception, *the government must first show "an objectively reasonable basis for concluding that the loss or destruction of evidence is imminent."* Second, we must "balance the interests by weighing the governmental interest being served by the intrusion against the individual interest that would be protected if a warrant were required."

> Thus, we first evaluate whether [Investigator] Bell had an objectively reasonable basis for concluding that the evidence of child pornography on the laptop would be destroyed if the computer was not seized immediately, pending application for a search warrant. The district court relied on the fact that Bell informed Bradley of the substance of his investigation and that Bradley's laptop contained the identifying marker the police were tracking. . . .

> We cannot say that the district court's determination that Bell reasonably feared Bradley would attempt to destroy the laptop or evidence on the laptop was clearly erroneous. Courts have doubted the wisdom of leaving the owner of easily-destructible contraband in possession of that contraband once the owner is aware that law-enforcement agents are seeking a search warrant. Had Bell left the laptop in Bradley's possession, Bradley could have attempted to destroy any computer files or the laptop itself. We agree with the district court below that it is objectively reasonable to seize a container an officer has probable cause to believe contains evidence of a crime, rather than leave it unguarded in the hands of a suspect who knows that it will be searched.

Id. at 103 (citations omitted) (emphasis added). From there, the court went on to conclude the governmental interest served by the intrusion outweighed the individual's interest protected by requiring a warrant. Id. at 104. The court considered, among other things, "the fact that the governmental interest in protecting evidence from destruction is particularly high where digital evidence is involved, because such evidence is inherently ephemeral and easily destructible," id. (citing United States v. Abbell, 963 F. Supp. 1178, 1199 (S.D. Fla. 1997)), and that "the government's interest in deterring the production and dissemination of child pornography is significant." Id. (citing United States v. Moore, 916 F.2d 1131, 1139 (6th Cir. 1990)). The court also stated that "because Bell seized Bradley's computer but did not search it until he acquired a search warrant, the initial seizure affected only Bradley's possessory interest in the laptop and did not implicate a privacy interest." Id. (citing Segura v. United States, 468 U.S. 796, 810 (1984)).[10]  Finally, the court

---

[10]The court notes that in Segura, a two-Justice plurality opined that where agents conducted a warrantless entry into the defendants' apartment and arrested the occupants based on probable cause of drug trafficking, but lacked any exigent circumstances, and then secured the premises for 19 hours while other agents obtained a search warrant for the apartment, the agents' "seizure" of the apartment and its contents to preserve

the status quo did not violate the Fourth Amendment. The plurality explained its opinion as follows:

> Different interests are implicated by a seizure than by a search. A seizure affects only the person's possessory interests; a search affects a person's privacy interests. Recognizing the generally less intrusive nature of a seizure, the Court has frequently approved warrantless seizures of property, on the basis of probable cause, for the time necessary to secure a warrant, where a warrantless search was either held to be or likely would have been held impermissible.

> We focused on the issue notably in [Chambers v. Maroney, 399 U.S. 42 (1970)], holding that it was reasonable to seize and impound an automobile, on the basis of probable cause, for "whatever period is necessary to obtain a warrant for the search." We acknowledged in Chambers that following the car until a warrant could be obtained was an alternative to impoundment, albeit an impractical one. But we allowed the seizure nonetheless because otherwise the occupants of the car could have removed the "instruments or fruits of crime" before the search. The Court allowed the warrantless seizure to protect the evidence from destruction even though there was no immediate fear that the evidence was in the process of being destroyed or otherwise lost. . . .

> Underlying these decisions is a belief that society's interest in the discovery and protection of incriminating evidence from removal or destruction can supersede, at least for a limited period, a person's possessory interest in property, provided that there is probable cause to believe that that property is associated with criminal activity.

> . . . . The sanctity of the home is not to be disputed. But the home is sacred in Fourth Amendment terms not primarily because of the occupants' *possessory* interests in the premises, but because of their *privacy* interests in the activities that take

concluded that, under a totality of the circumstances, it was reasonable for the investigators to seize the laptop immediately and that the 26-hour delay in obtaining the warrant was not unreasonable. Id. at 105.

In Saddler, 498 F. App'x 524, police officers received calls at 1:24 a.m. reporting shots fired and a burglary at a residence. Responding officers arrived at the house and observed bullet holes in the house and fresh shell casings in the street. Officers conducted a protective sweep, during which they found a locked safe that had been removed from the house and left in the yard. The homeowner, defendant Christopher Saddler, returned home a few minutes later. He informed the

---

place within. "[T]he Fourth Amendment protects people, not places."

As we have noted, however, a seizure affects only possessory interests, not privacy interests. Therefore, the heightened protection we accord privacy interests is simply not implicated where a *seizure* of premises, not a search, is at issue. We hold, therefore, that securing a dwelling, on the basis of probable cause, to prevent the destruction or removal of evidence while a search warrant is being sought is not itself an unreasonable seizure of either the dwelling or its contents. We reaffirm at the same time, however, that, absent exigent circumstances, a warrantless search . . . is illegal.

468 U.S. at 805-13 (Burger, C.J. & O'Connor, J., plurality) (internal citations and footnotes omitted) (emphasis in original). This plurality opinion would appear to be consistent with the holding in Respress.

officers that people were shooting at him from his house, that he was unarmed, and that he was not permitted to carry firearms as an ex-felon. Saddler denied knowing the combination to the safe. The officers suspected the safe might have contained drugs or money, as the target of the burglary, so they transported the safe to another location until a drug canine could be utilized to determine whether drugs were stored in the safe. The following afternoon, at 1:45 p.m., a police canine sniffed the safe and gave a positive alert. A search warrant was obtained at 11:16 p.m. that evening. Upon executing the warrant, officers found marijuana, digital scales, two guns, and a photo identification of Saddler. The district court denied Saddler's motion to suppress, in part because it found that the officers legitimately were concerned that Saddler or others might remove the safe or tamper with its contents if it were left at the scene. Id. at 525-27. The Court of Appeals affirmed. The court closely tracked the analysis in Bradley, again explaining that in order to establish exigent circumstances, the government must first show "an objectively reasonable basis for concluding that the loss or destruction of evidence is imminent." Id. at 528 (quoting Sangineto-Miranda, 859 F.2d at 1511). The court stated that

We cannot say that the district court was clearly
erroneous in concluding that the officers reasonably
feared that Saddler or someone else would attempt to
destroy the evidentiary value of the safe or its
contents.  Because the safe was small and easy to
transport, the burglar or burglars had very nearly
succeeded in stealing it from inside the house.  The
officers hoped to preserve any fingerprints that could
be lifted from the safe and did not want others to
compromise the prints.  When Saddler initially
admitted that he owned the safe but refused to open
it, moreover, it was objectively reasonable for the
officers to believe that Saddler or a third party
might remove the evidence from inside the safe, take
the safe from the scene, or otherwise tamper with it.
Given Saddler's evasive responses to questioning, the
size of the safe, its location, and its importance to
the investigation, we conclude that it was not
unreasonable for the police to seize the safe.

Id. at 529.  After concluding that the officers' fear that

evidence would be lost or destroyed was objectively reasonable,

the court proceeded to further find that the government's

interest in solving crimes was significant, the evidence seized

was materially important, the seizure affected only Saddler's

possessory interest, no liberty interest was impinged by the

seizure, and the scope and duration of the seizure were

reasonable.  Id. at 529-31.

The court finds that the same governmental interests that

the Sixth Circuit found in Bradley and Saddler to be significant

are also present in the case at bar.  The government's interest

in protecting evidence from destruction is particularly high

where digital evidence is involved, the government's interest in

deterring the production of child pornography and sexual exploitation of minors is significant, and the seizure of Friar's iPad only affected his possessory interest and not his privacy interest. In fact, because Friar was out of state at the time and there is no evidence he attempted to gain access to the iPad prior to its search, the officers' 12-hour interference with his possessory interest in the iPad was far less intrusive than the pre-warrant seizures of Respress's suitcase, Bradley's laptop, or Saddler's safe. Friar's liberty interest was not impinged by the seizure of his iPad.

Furthermore, both the execution and the duration of the seizure were reasonable. The responding officers, apparently out of concern of potentially infringing upon Friar's privacy interests, declined to view the images on the iPad until they obtained a search warrant (even though they would have been justified in viewing the images, since Riba had already viewed all of the images before they arrived). See Lichtenberger, 786 F.3d at 490. The officers obtained a search warrant for the iPad approximately 12 hours later, which, given the time of night when it was initially seized, was a reasonable length of time.

But what is missing in the present case – and what Bradley and Saddler require but Respress does not – is evidence that the

officers reasonably feared the imminent destruction or loss of incriminating evidence. The court believes that it need not weigh in on this conflict, because even assuming, *arguendo*, that the initial seizure of the iPad was unlawful, the "independent source doctrine" applies and precludes application of the exclusionary rule.

The independent source doctrine rests on the proper balance to be struck between the "'interest of society in deterring unlawful police conduct and the public interest in having juries receive all probative evidence of a crime.'" <u>Murray v. United States</u>, 487 U.S. 533, 537 (1988) (quoting <u>Nix v. Williams</u>, 467 U.S. 431, 443 (1984)). The exclusionary rule should "'put[] the police in the same, not a *worse*, position tha[n] they would have been in if no police error or misconduct had occurred.'" <u>Id.</u> (emphasis in original) (quoting <u>Nix</u>, 467 U.S. at 443). Accordingly, where "'challenged evidence has an independent source, exclusion of such evidence would put the police in a worse position than they would have been in absent any error or violation.'" <u>Id.</u> (quoting <u>Nix</u>, 467 U.S. at 443). This doctrine applies to both evidence "obtained for the first time during an independent lawful search" and "evidence initially discovered during, or as a consequence of, an unlawful search, but later

obtained independently from activities untainted by the initial illegality." Id.

An illustration of the application of this doctrine can be found in the Supreme Court's decision in Segura. In that case, law enforcement received information that Andres Segura and Luz Marina Colon were trafficking in cocaine from their New York apartment. Acting on this information, agents conducted an investigation, during which time they saw Segura and Colon meet with two other individuals (Enrique Rivudalla-Vidal and Esther Parra) at a restaurant and observed Colon deliver a bulky package to Parra. Agents followed and then arrested Rivudalla-Vidal and Parra, and found cocaine in their possession. Rivudalla-Vidal admitted that he had purchased the cocaine from Segura and that Colon had made the delivery. He informed the agents that Segura was to call him at 10:00 p.m. that evening to learn if Rivudalla-Vidal had sold the cocaine, in which case Segura was to deliver additional cocaine. Between 6:30 p.m. and 7:00 p.m. the same day, agents received authorization from an Assistant U.S. Attorney to arrest Segura and Colon. The agents were advised that because of the lateness of the hour, a search warrant for the apartment probably could not be obtained until the following day, but that the agents should proceed to secure the premises to prevent the destruction of evidence. At about

7:30 p.m., the agents arrived at Segura and Colon's apartment and established surveillance. At 11:15 p.m., Segura entered the lobby of the apartment building, where he was immediately arrested. The agents took him to his apartment, and when they knocked on the apartment door, a woman later identified as Colon appeared. The agents then entered with Segura, without requesting or receiving permission. The agents conducted a limited security check of the apartment and in the process, the agents observed, in a bedroom in plain view, a triple-beam scale, jars of lactose, and numerous small cellophane bags. None of these items was disturbed by the agents. Colon, Segura, and three other occupants who were found inside the apartment were taken into custody. Two agents remained in the apartment awaiting the warrant. Due to an administrative delay, the warrant was issued and the search was performed at approximately 6:00 p.m., about 19 hours after the agents' initial entry into the apartment. In the search pursuant to the warrant, agents discovered almost three pounds of cocaine, 18 rounds of .38-caliber ammunition, more than $50,000 cash, and records of narcotics transactions. Agents seized these items, together with those observed during the security check the previous night. Id. at 799-801.

Defendants moved to suppress all of the evidence seized from the apartment, the items discovered in plain view during the initial security check and those not in plain view first discovered during the subsequent warrant search. The district court granted the motion, ruling that there were no exigent circumstances justifying the initial entry into the apartment. Accordingly, the district court held that the entry, the arrest of Colon and search incident to her arrest, and the effective seizure of the drug paraphernalia in plain view were illegal, and that the evidence seized under the valid warrant were "fruit of the poisonous tree" because absent the illegal entry and "occupation" of the apartment, this evidence might have been destroyed by Colon. On appeal, the Court of Appeals affirmed the district court's holding that the initial warrantless entry was not justified by exigent circumstances and that the evidence discovered in plain view during the initial entry must be suppressed. However, the Court of Appeals reversed the district court's ruling requiring suppression of the evidence seized under the valid warrant, describing as "prudentially unsound" the district court's decision to suppress that evidence simply because it could have been destroyed had the agents not illegally entered. Id. at 801-03.

The Supreme Court affirmed in a 5-4 decision. The Court explained at the outset that the government did not challenge the lower courts' findings that the initial warrantless entry and the limited security search were not justified by exigent circumstances and were therefore illegal. Nevertheless, the Court upheld the search under the independent source doctrine:

> Petitioners also argue that even if the evidence was not subject to suppression as primary evidence "seized" by virtue of the initial illegal entry and occupation of the premises, it should have been excluded as "fruit" derived from that illegal entry. Whether the initial entry was illegal or not is irrelevant to the admissibility of the challenged evidence because there was an independent source for the warrant under which that evidence was seized. Exclusion of evidence as derivative or "fruit of the poisonous tree" is not warranted here because of that independent source.

> None of the information on which the warrant was secured was derived from or related in any way to the initial entry into petitioners' apartment; the information came from sources wholly unconnected with the entry and was known to the agents well before the initial entry. No information obtained during the initial entry or occupation of the apartment was needed or used by the agents to secure the warrant. It is therefore beyond dispute that the information possessed by the agents before they entered the apartment constituted an independent source for the discovery and seizure of the evidence now challenged. This evidence was discovered the day following the entry, during the search conducted under a valid warrant; it was the product of that search, wholly unrelated to the prior entry. The valid warrant search was a "means sufficiently distinguishable" to purge the evidence of any "taint" arising from the entry. Had police never entered the apartment, but instead conducted a perimeter stakeout to prevent anyone from

entering the apartment and destroying evidence, the contraband now challenged would have been discovered and seized precisely as it was here. The legality of the initial entry is, thus, wholly irrelevant under [Wong Sun v. United States, 371 U.S. 471 (1963)] and Silverthorne Lumber Co. v. United States, 251 U.S. 385 (1920).

Our conclusion that the challenged evidence was admissible is fully supported by our prior cases going back more than a half century. The Court has never held that evidence is "fruit of the poisonous tree" simply because "it would not have come to light but for the illegal actions of the police." That would squarely conflict with Silverthorne and our other cases allowing admission of evidence, notwithstanding a prior illegality, when the link between the illegality and that evidence was sufficiently attenuated to dissipate the taint. By the same token, our cases make clear that evidence will not be excluded as "fruit" unless the illegality is at least the "but for" cause of the discovery of the evidence. Suppression is not justified unless "the challenged evidence is in some sense the product of illegal governmental activity." The illegal entry into petitioners' apartment did not contribute in any way to discovery of the evidence seized under the warrant; it is clear, therefore, that not even the threshold "but for" requirement was met in this case.

The dissent contends that the initial entry and securing of the premises are the "but for" causes of the discovery of the evidence in that, had the agents not entered the apartment, but instead secured the premises from the outside, Colon or her friends if alerted, could have removed or destroyed the evidence before the warrant issued. While the dissent embraces this "reasoning," petitioners do not press this argument. The Court of Appeals rejected this argument as "prudentially unsound" and because it rested on "wholly speculative assumptions." Among other things, the Court of Appeals suggested that, had the agents waited to enter the apartment until the warrant issued, they might not have decided to take Segura to the apartment and thereby alert Colon. Or, once

alerted by Segura's failure to appear, Colon might have attempted to remove the evidence, rather than destroy it, in which event the agents could have intercepted her and the evidence.

We agree fully with the Court of Appeals that the District Court's suggestion that Colon and her cohorts would have removed or destroyed the evidence was pure speculation. Even more important, however, we decline to extend the exclusionary rule, which already exacts an enormous price from society and our system of justice, to further "protect" criminal activity, as the dissent would have us do.

It may be that, if the agents had not entered the apartment, petitioners might have arranged for the removal or destruction of the evidence, and that in this sense the agents' actions could be considered the "but for" cause for discovery of the evidence. But at this juncture, we are reminded of Justice Frankfurter's warning that "[s]ophisticated argument may prove a causal connection between information obtained through [illegal conduct] and the Government's proof," and his admonition that the courts should consider whether "[a]s a matter of good sense . . . such connection may have become so attenuated as to dissipate the taint." The essence of the dissent is that there is some "constitutional right" to destroy evidence. This concept defies both logic and common sense.

Id. at 813-16 (internal citations and footnotes omitted); see also United States v. Straughter, 950 F.2d 1223, 1231 (6th Cir. 1991) (holding that even though officers violated Fourth Amendment in securing apartment, they later seized the evidence therein pursuant to a valid search warrant based on independent information).

- 30 -

Here, the warrantless seizure of the iPad did not cause the officers to discover the challenged evidence. The officers seized the iPad for the purpose of preserving potential evidence while they obtained a search warrant. The officers did not view any of the contents on the iPad, they diligently proceeded to obtain a warrant, and the affidavit supporting the warrant did not contain any evidence derived from the iPad or its seizure. The evidence obtained as a result of the search warrant is not a "fruit" of the alleged illegal seizure, because the seizure did not cause the officers to obtain the search warrant or in any way taint the subsequent search. Put another way, the officers did not "exploit" the seizure of the iPad to discover the evidence; it was discovered "by means sufficiently distinguishable" from that seizure. United States v. Figueredo-Diaz, 718 F.3d 568, 574, 576 (6th Cir. 2013) (quoting Wong Sun, 371 U.S. at 487–88). Because the exclusionary rule only "forbids the government from using evidence *caused* by an illegal seizure," the court finds that it does not apply here. United States v. Clariot, 655 F.3d 550, 555 (6th Cir. 2011) (emphasis in original).

## C.  **Sufficiency of the Search Warrant**

Finally, Friar asserts that the search warrant authorizing the search of the iPad was "defective, or based on unreliable,

orchestrated information."  This statement could be construed either as an argument that the affidavit lacked probable cause or that it was based on unreliable information provided by Riba.

"An issuing judge's findings of probable cause should be given great deference by the reviewing court and should not be reversed unless arbitrarily exercised." United States v. Combs, 369 F.3d 925, 937 (6th Cir. 2004) (quoting United States v. Miller, 314 F.3d 265, 268 (6th Cir. 2002)) (internal quotation marks omitted).  "As long as the issuing judge had a 'substantial basis' for determining that a search would uncover evidence of wrongdoing, the warrant must be upheld." Id. (quoting Miller, 314 F.3d at 937).  The Sixth Circuit has recognized on numerous occasions that when an informant is identified by name in an affidavit and has personally observed evidence of a crime, independent corroboration of the informant's story is not necessary to a determination of probable cause.  See United States v. Braden, 248 F. App'x 700, 703 (6th Cir. 2007) (upholding as sufficient an affidavit stating that a named informant had volunteered against her interest that she personally observed drugs at the defendant's residence without any other corroboration or indicia of reliability); United States v. McCraven, 401 F.3d 693, 698 (6th Cir. 2005) (holding that "independent corroboration of an

informant's story is not necessary to a determination of probable cause"); Combs, 369 F.3d at 937-938 ("This court recognizes that '[w]hen a witness has seen evidence in a specific location in the immediate past, and is willing to be named in the affidavit, the 'totality of the circumstances' presents a 'substantial basis' for conducting a search [of that location].'") (quoting United States v. Pelham, 801 F.2d 875, 878 (6th Cir. 1986)) (alterations in original); Miller, 314 F.3d at 269-70 (upholding as sufficient an affidavit containing information from a named informant and reasoning that "there could hardly be more substantial evidence of the existence of the material sought and its relevance to a crime" than the informant's direct viewing of evidence) (internal quotation marks omitted).

Riba, a concerned citizen who worked as Friar's housekeeper for seven years, was identified by name in the affidavit and provided detailed information regarding evidence of criminal activity that she personally observed.  As such, the judge had a substantial basis for determining that a search of the iPad would uncover evidence of criminal activity without additional information concerning Riba's reliability or independent police corroboration.  The search warrant was supported by probable cause.

### III. RECOMMENDATION

For the above reasons, it is recommended that Friar's motion to suppress be denied.

Respectfully submitted,

s/ Tu M. Pham
TU M. PHAM
United States Magistrate Judge

February 12, 2016
Date

### NOTICE

**ANY OBJECTIONS OR EXCEPTIONS TO THIS REPORT MUST BE FILED WITHIN FOURTEEN (14) DAYS AFTER BEING SERVED WITH A COPY OF THE REPORT. 28 U.S.C. § 636(b)(1)(C). FAILURE TO FILE THEM WITHIN FOURTEEN (14) DAYS MAY CONSTITUTE A WAIVER OF OBJECTIONS, EXCEPTIONS, AND ANY FURTHER APPEAL.**